PAUL A. ALFIERI, as Administrator of the Estate of JOHN B. ALFIERI, Deceased, et al., Respondents, *v.* CABOT CORPORATION et al., Appellants.

First Department, December 20, 1962.

456

*Jerome Doyle* of counsel (*Alan S. Rasch* with him on the brief; *Cahill, Gordon, Reindel & Ohl,* attorneys), for appellants.

*Augustin J. San Filippo* of counsel (*Borris M. Komar* with him on the brief), for respondents.

STEVENS, J. This is an appeal from a judgment entered May 25, 1962 in favor of plaintiffs and against the defendants, after a jury trial. The jury returned a verdict for plaintiff Warren Carlie in the sum of $12,500. The jury returned a verdict for plaintiff Paul Alfieri, as administrator of the goods, chattels and credits of John B. Alfieri, deceased, in the sum of $180,000 for wrongful death and $20,000 for conscious pain and suffering. On motion of the defendants, the Trial Judge ordered a new trial unless plaintiff Alfieri stipulated to reduce the verdict to $90,000 plus interest for wrongful death of John B. Alfieri and $7,500 for pain and suffering. Plaintiff so stipulated.

John Alfieri, the deceased, and Carlie, both residents of New York, on Saturday, November 16, 1957, decided to spend a week end at a cabin owned by Carlie in rural Pennsylvania. On the way they stopped in Broadheadsville, Pennsylvania, and purchased groceries, corn and a bag of charcoal from the defendant, the Great Atlantic and Pacific Tea Company (herein A & P) and steaks from an adjoining independent market. The charcoal, manufactured by defendant Cabot Corporation, was packaged in 10-pound sacks, and bore a label with the words "Cabot E-Z Glo Charcoal Briquets" in prominent type, followed in somewhat smaller type by the words "easy to light and quick to give off heat that's even and long lasting. Ideal for cooking in or out of doors. Excellent for picnics and barbecues and for emergencies." A picture of a steak on a grill appeared on the bag adjoining the label. Testimony at the trial indicated the briquets were not a natural fuel product but a manufactured product containing 72% natural carbon and 28% other chemical ingredients.

That evening Alfieri and Carlie used the briquets in a charcoal brazier outside the cabin for the cooking of food. Thereafter, according to Carlie's testimony, the brazier was brought into the cabin to complete the cooking of ears of corn. The defendants contend it was brought into the cabin, a structure approximately 26 by 24 feet, with 7 windows and 2 doors, for the purpose of heating. From the testimony the cabin was a simple frame structure without fireplace, chimney or door sills, not too soundly constructed, for there were spaces between the door and floor and also a space where the wall siding joined the roof.

Eventually the young men (Carlie was age 25 years, Alfieri, age 27 years) went to bed, leaving the briquets burning in the brazier. Carlie awoke very ill the following Monday morning, stumbled out of the cabin and subsequently made his way to a doctor in the nearby town. The State Troopers who were notified, found Alfieri dead. The stated cause of death was

carbon monoxide poisoning. Carlie also suffered from monoxide poisoning.

This action by the administrator and Carlie was brought against the retail seller, A & P, and the manufacturer, Cabot Corporation (herein Cabot), for damages for breach of warranty and negligence. Alfieri sought damages for pain and suffering and wrongful death. The trial court dismissed all of plaintiffs' causes of action for breach of warranty (to which plaintiffs excepted) and permitted the case to go to the jury solely on the question of negligence as to both defendants. The jury found for the plaintiffs. The amounts were later reduced by stipulation as to Alfieri. It is from the judgments entered for both plaintiffs that defendants appeal.

Appellants urge, *inter alia*, plaintiffs were using the charcoal briquets for an unforeseeable purpose, in an unforeseeable manner, and it was error to permit the case to go to the jury. Also, a manufacturer cannot be held liable for failure to warn a remote purchaser of obvious dangers known to all persons of common experience. Error is also alleged in the refusal of a request to charge and to the charge as given. Appellants contend the verdict, even as reduced, is excessive, and it was error to add interest to the verdict for wrongful death computed from the date of death. On the question of interest, it might be noted that both parties agreed before the court that New York law applied as to damages and contributory negligence.

Respondents, in support of the determination, contend the jury findings of a breach of defendants' duty to warn purchasers of the latent and lethal danger in the briquets is amply supported by the evidence, the danger was foreseeable, damages awarded were not excessive, and the judgment appealed from should be affirmed.

Considering first the question of liability as to A & P. Nothing appears in the record to indicate that Cabot is other than a reputable manufacturing concern. Testimony at the trial was to the effect charcoal is generally used for cooking, because its cost would be prohibitive if used by the casual customer for heating. There was testimony also that what might be termed the dangerous potential of charcoal or charcoal briquets, or its probable lethal quality from combustion under certain conditions, is not generally known to the public. This was a packaged product when purchased and when resold in the same container by A & P, and there was nothing to indicate that its use by the ultimate purchaser might be harmful. Nor was there any proof that A & P had actual knowledge of the dangerous qualities of the briquets. At most A & P was a conduit between the manu-

facturer and the members of the purchasing public, and it gave no guarantees or warranties in connection with the sale of the briquets. Nothing appears in the record to warrant an inference that Carlie and Alfieri relied upon the special competence of A & P as the vendor, or that A & P by mere inspection could have discovered the danger. Under all of these circumstances A & P should not be held liable even though it might have discovered the dangerous character of the briquets by a test under controlled conditions. There was no obligation upon it to make such test. (Cf. *Ebbert* v. *Philadelphia Elec. Co.,* 330 Pa. 257; Restatement, Torts, 1948 Supp., §§ 401, 402; 2 Harper & James, Torts, p. 1597 *et seq.*; *Bruckel* v. *Milhau's Son,* 116 App. Div. 832; cf. *Santise* v. *Martins, Inc.,* 258 App. Div. 663; *Brown* v. *Hersch Chemists,* 281 App. Div. 43, affd. 305 N. Y. 755; 2B Warren, Negligence, p. 181 *et seq.*)

A different question is posed as to the liability of Cabot, the manufacturer. The label on the packaged briquets announced that the briquets were " easy to light and quick to give off heat * * * [i]deal for cooking in or out of doors ". Since these briquets were a manufactured product (carbon to which chemicals were added), the representation concerning heat, and ideal for cooking indoors, would serve to allay any possible fears even by a better informed public than existed at the time of this tragic occurrence. It could also lull the user into a false sense of security. Moreover, the reference to " heat " even to the casual mind, might well seem not to be restricted to the sole use for cooking either indoors or outdoors.

Testimony at the trial indicated that, unlike other fuels used for cooking or heating, if these briquets were used indoors without adequate ventilation, a high concentration of carbon monoxide would result. Charcoal is free burning, may continue burning in the absence of adequate ventilation, and the carbon monoxide produced will not alert the user to his danger, whereas other fuels, for example coal, would go out under circumstances where charcoal would continue to burn. Fuel oil would use up the nitrogen, and before an appreciable fraction of carbon monoxide appeared in the air, a smoky flame would give warning, in addition to the sulphurous odorous gases which might be given off by sulphur compounds in the oil. Even wood, where the oxygen is steadily decreasing, would tend to smoke itself, and the person, out. However, oil, coal and wood, when used indoors, would be in containers especially designed for such use. The charcoal briquets consisted of approximately 68% to 72% pure carbon, and burn primarily to carbon monoxide. With restrained oxygen (as existed in this cabin, or in any place

inadequately ventilated) the percentage of carbon monoxide goes up, the maximum content being in the area of 6%, after which an explosion would occur because of the flammability of carbon monoxide. There was testimony also that four tenths of 1% could cause death or serious injury, and three quarters of one pound of briquets burning in the cabin space involved here under the existing conditions, would emit a lethal dose of carbon monoxide in one hour. Testimony on behalf of the defendant was that the company knew the briquets would be used indoors as well as outdoors, but no tests were made to determine the amount of carbon monoxide that would be given off by the use of these briquets in an enclosed area. It was conceded as a fact that charcoal and charcoal briquets were also used as a fuel to heat. Cabot's chemical engineer, who directed the experiments to develop the briquets, testified he knew of the properties of charcoal, and that their use indoors without proper ventilation was dangerous.

It may fairly be said that the use of these briquets indoors as a fuel for heating could reasonably have been foreseen. In spite of the dangerous potential which would result from use indoors, indeed even the invitation to indulge in such use, no words of caution or warning were included on the label. The fact that the briquets might have been used more frequently out of doors than indoors is not conclusive nor does it establish the standard of care required. Where the use indoors was visualized or contemplated, and the dangerous propensities of the fuel known, a duty existed to warn the user of the hazard. The jury's verdict was a finding of foreseeability, and Cabot as manufacturer was properly held liable (*Maize* v. *Atlantic Refining Co.,* 352 Pa. 51; *MacDougall* v. *Pennsylvania Power & Light Co.,* 311 Pa. 387). There was here a failure to warn of the inherently dangerous nature of these briquets when used as advertised. Probable injury might reasonably have been foreseen as the result of such failure, though the precise nature of the injury as resulted here need not have been anticipated with any degree of exactness (*New York Eskimo Pie Corp.* v. *Rataj,* 73 F 2d 184; 2 Restatement, Torts, § 388). It is not essential that there be a defect in the manufacture of the chattel before liability may be imposed where, as here, the manufacturer knew the purpose for which the chattel might be used and was aware of the dangers surrounding its use under at least one of the invited conditions. In such circumstances the manufacturer has a duty to bring to the knowledge of those who are to use the chattel such directions as would make it reasonably safe for the use for which it is declared suitable (cf. *Alexander* v.

*Torridaire Co.*, 265 N. Y. 616; *Maher* v. *Clairol*, 263 App. Div. 848; cf. *New York Eskimo Pie Corp.* v. *Rataj, supra*).

It was not error to exclude testimony concerning the customary practice of labelling briquet bags, nor that this was the first suit of its kind, or that Cabot never had notice that briquets would be burned without adequate ventilation. There was testimony of numerous openings in the cabin affording some ventilation resulting, apparently, from construction by inexperienced hands. Customary methods of conduct would not be controlling but, at most, a circumstance to be considered. Its exclusion was not error where, as here, the manufacturer by its label invited indoor use (cf. *Maize* v. *Atlantic Refining Co., supra*; *Genesee County Patrons Fire Relief Assn.* v. *Sonneborn Sons*, 263 N. Y. 463; cf. *Crist* v. *Art Metal Works*, 230 App. Div. 114, affd. 255 N. Y. 624; *Egan* v. *Horn Co.*, 248 App. Div. 697), and even warranted it fit for that purpose (cf. *Pearlman* v. *Garrod Shoe Co.*, 276 N. Y. 172). This was not an obvious but a latent danger.

The questions of negligence and contributory negligence were for the jury, and it cannot be said that their determinations, as a matter of law are incorrect. The court charged correctly and without exception on those issues.

The verdict as to Carlie is not excessive and should be affirmed.

There is no evidence to sustain the award to plaintiff Alfieri for conscious pain and suffering. There is no evidence that the deceased ever regained consciousness, or experienced pain. In fact the testimony offered by plaintiff was to the effect that carbon monoxide has a "stuporing, stupefying effect" "of not making a person alert" to the danger. Carlie, the other plaintiff, had no recollection of anything until he awoke on Monday.

It was agreed the question of damages would be governed by the law of New York. The verdict for Alfieri, even as reduced, remains grossly excessive. The decedent earned in excess of $5,000 per year, was age 27 and single. He contributed $2,600 per year to his parents who had a life expectancy of 21 years. The father of decedent was financially independent and there was at most minimal reliance upon decedent's contribution. The measure of damages for wrongful death is the reasonable expectation of pecuniary loss to the relatives enumerated or for whose benefit the action is brought (Pa. Stat., tit. 12, §§ 1601, 1602; N. Y. Decedent Estate Law, § 132).

Under the law of New York, which the parties agreed would apply in this case, interest from the date of the wrongful death is an element of damages (Decedent Estate Law, § 132; *Cleghorn*

v. *Ocean Acc. & Guar. Corp.*, 244 N. Y. 166). While our courts have recognized " the question of the proper measure of damages is inseparably connected with the right of action (*Chesapeake & Ohio Ry. Co.* v. *Kelly*, 241 U. S. 485, 491) " (*Davenport* v. *Webb*, 11 N Y 2d 392, 393) and have not added prejudgment interest " unless *lex loci delictus* authorizes such an addition " (p. 394), we find nothing in that case or in the statute which forbids the parties from agreeing, for their convenience, that the New York law of damages shall apply.

Accordingly, the judgment appealed from should be modified on the law and on the facts to reverse and dismiss the cause of action for conscious pain and suffering as to plaintiff Alfieri, to reverse and dismiss the complaint as to A & P, and the judgment in favor of plaintiff Alfieri for wrongful death reversed and a new trial ordered, with costs to abide the event, unless plaintiff stipulates to accept $30,000 plus interest from the date of decedent's death, in which event it is affirmed, as modified, without costs. In all other respects the judgment appealed from should be affirmed, without costs.

STEUER, J. (dissenting). In November, 1957 the plaintiff, Warren Carlie, owned a cabin at Gilbert, Pennsylvania. On November 16 of that year he drove with the deceased, John Alfieri, to Broadheadsville, the nearest town where there were stores. Arriving there in the early afternoon, they stopped at the store of the defendant Great Atlantic & Pacific Tea Company and bought some food and supplies. Among the supplies was a package of charcoal briquets manufactured by Cabot Corporation. These briquets were sold in bags of heavy paper which bore the following legend:

" E-Z Glo Charcoal Briquets

" Easy to light and quick to give off heat that's even and long lasting. Ideal for cooking in or out of doors. Excellent for picnics and barbecues and for emergencies."

The two young men proceeded to the cabin at Gilbert, where they planned to spend the week end. They cooked their dinner out of doors. The cooking was done on a brazier. It is plaintiff's claim that one of the items of their dinner was corn and that the water in which to cook it had not come to a boil by the time they had finished the rest of their meal. They thereupon took the pot containing the water and the brazier with the burning briquets into the cabin. The water in due course boiled, and the corn was cooked and eaten. This fact is disputed. Photographs taken thereafter show no pot, the Pennsylvania State

Troopers who investigated found no corn cobs and no pot, and Carlie, in his earlier description of events, omits any mention of corn or cooking in the cabin. However, he so testified at the trial and, as plaintiff's able counsel points out, the jury could have so found, and I will conclude that this was the fact.

November 16 was a Saturday. On the following Monday morning, Carlie awoke feeling ill. He saw Alfieri still in bed and he left the cabin. He sought medical aid. While he was away, State Troopers stopped in at the cabin and found Alfieri dead. It was soon found that Alfieri had died and Carlie was suffering from carbon monoxide poisoning.

To complete a statement of the facts, the cabin was an unfinished one-room structure. While the walls, roof and floor were complete, they were unlined and not air proof. There was no fireplace or chimney. There were windows but they were not opened on the night in question. The briquets are processed charcoal. They share the qualities of all fuels in that in burning they give off carbon monoxide, the quantity being in relation to the amount burned. A quantity sufficient to cook with, if left to burn in an unventilated room, will produce a percentage in the air that can be lethal.

The court found nothing to base a charge of negligence in the manufacture of these briquets and left the question of liability to the jury on the issue of whether there was a duty to warn purchasers of the danger of using this product, and the related question of whether the legend on the bag would mislead a user to his peril. The jury found that it would. My colleagues hold that this finding is to be sustained against the manufacturer and not against the retailer. I fail to see how one can be liable without the other. The plaintiffs pleaded breach of warranty. While this was stricken by the trial court, the ruling was duly excepted to and the point raised on the appeal. As recovery was had on a basis of express warranty, there is, of necessity, a breach of the implied warranty of fitness.

However, in the view that I take, this determination is not of particular significance. The plaintiffs failed to prove a cause of action against the manufacturer. It is elementary that there is no duty to warn against things that are of common knowledge. Plaintiffs do not dispute this but argue that the amount of carbon monoxide produced by charcoal and the amount that is lethal are not matters generally known. In these contentions they are undoubtedly correct, but that is not the test. The test is whether it is generally known that burning a combustible in an unventilated room will probably cause lethal fumes. This has been

made a matter of common knowledge and in the past 40 years has been impressed upon the public by the wide publicity given to not infrequent fatalities resulting from the consumption of gasoline by a running motor in a garage. It is common knowledge that fire burns, and that the composition of the surrounding atmosphere undergoes a change that makes it dangerous unless freely replaced. The fact that people are sometimes careless in applying that knowledge does not detract from its being widely and generally known.

The legend on the container must be read in connection with that knowledge. Unless it can be read as stating that some special property in this product reverses the well-known law of nature, it has no special significance. Articles of commerce are to be used as intended. Otherwise there is no limit to the potentiality for injury. Nor can a manufacturer be expected to make his product foolproof. While it is true that increasing mechanization and complexity have put upon the manufacturer an increased burden of care for the protection of his consumers (*Dalehite* v. *United States,* 346 U. S. 15, 51), the burden should not go beyond endurable limits. To place the risk on him of the consumer's misuse by ignoring ordinary principles is to make the manufacturer an insurer who protects his customers against themselves.

The statement that the briquets are ideal for indoor cooking does not imply that they are safe under conditions in which other combustibles, such as wood, coal or any of the liquid fuels, would be unsafe. Danger from contamination from the air is no more ruled out than danger from the flames. It could not be argued that one who burned his hand in the flames had a cause of action because of the legend. No more should it be heard from one who paid no heed to the property of combustibles to poison the air of an enclosed space.

Ordinarily the quantum of damages is not a matter of import in a situation where no damages are in order. Here, however, the award of the jury is of peculiar significance. In the claim for wrongful death the jury award was $180,000, and for conscious pain and suffering $20,000. The trial court reduced these figures to $90,000 and $7,500, respectively. My colleagues have further reduced them to $30,000 and elimination of any recovery for conscious pain and suffering. The last is necessarily correct as there is no proof that the deceased ever regained consciousness or suffered in any degree. It follows that the jury's verdict on wrongful death alone was excessive by 600%. This is no mere overvaluation. It demonstrates a complete disregard of the court's instructions and the use of criteria other than those

given them. It also shows that the verdict is the result of emotion rather than appraisal of the facts, and it casts a cloud upon the verdict as a factual resolution in all respects.

Even the figure of $30,000 cannot be justified. The deceased was unmarried and living with his parents. His father and mother were in the same age group and each had a life expectancy of 20.9 years. The deceased and his father worked for the same concern and the father earned in excess of $10,000 a year, the son about $5,300. It is claimed that he contributed $2,600 a year to his parents. Aside from the fact that this was not a contribution but paid partially for his board and lodging, is it to be contemplated that this young man would never marry and that he would devote his earnings to the support of his parents who made twice what he himself earned? To realize $30,000 it would be required that he contribute his entire earnings for a period of five and a half years without retaining for himself, or his parents spending for him, a single cent for food, lodging, clothing or anything else. Moreover, this is on the assumption that nothing was to be deducted from his earnings for taxes. When these are considered, the utter impossibility that this figure represents an evaluation of his future contributions becomes manifest.

The judgment should be reversed and the complaint dismissed as to both defendants.

BOTEIN, P. J., VALENTE and McNALLY, JJ., concur with STEVENS, J.; STEUER, J., dissents and votes to reverse and dismiss the complaint as to both defendants in opinion.

Judgment modified on the law and on the facts to reverse and dismiss the cause of action for conscious pain and suffering as to plaintiff Alfieri, to reverse and dismiss the complaint as to A & P, and the judgment in favor of plaintiff Alfieri for wrongful death reversed and a new trial ordered, with costs to abide the event, unless plaintiff stipulates to accept $30,000 plus interest from the date of decedent's death, in which event it is affirmed, as modified, without costs. In all other respects the judgment appealed from is affirmed, without costs. Settle order on notice.