Francis MORANI
and
Liberty Mutual Insurance Company,
Libelants,

v.

AGATHA FISHERIES, INC.,
and
Bromfield Corporation, Respondents,
No. 60–57–C.

United States District Court
D. Massachusetts.

Jan. 17, 1963.

Thomas D. Burns, Boston, Mass., for libelants.

James A. Whipple and Robert J. Hallisey, Boston, Mass., for respondents.

CAFFREY, District Judge.

This action, originally filed as a complaint on the law side of the court, was subsequently transferred to the admiralty, side. When filed, the action was by Francis Morani v. Dominic Tringale. Thereafter, various amendments to the pleadings were allowed, substituting Agatha Fisheries, Inc., a Massachusetts corporation, as defendant in place of

Dominic Tringale; adding Liberty Mutual Insurance Company, the workmen's compensation insurer of Morani's employer, as a party-plaintiff; and adding Morani's employer, Bromfield Corporation, as an impleaded third-party defendant.

The amended complaint contained two counts, one based on unseaworthiness and one on common law negligence. At the conclusion of libelants' evidence, respondent Agatha Fisheries, Inc. moved for judgment in its favor on each count. Count one, premised on unseaworthiness, was dismissed after a concession in open court by the libelant that he had been unable to sustain his burden of proof on the unseaworthiness count, for the reason that the evidence made it clear that the F/V AGATHA had been withdrawn from navigation for about two months prior to the accident involved. The case is now ripe for decision on Count Two, the negligence count.

I find the following facts. In November of 1957, the F/V AGATHA was tied up in East Boston at the boat repair yard of Bromfield Corporation for the purpose of removal of her old main engine and installation of a new Diesel engine. No written contract covering this work was executed by the parties, and the work was done pursuant to an oral "understanding." On January 3, 1958, the day of the incident which gave rise to this litigation, the vessel was still undergoing repair to her engine system, and at approximately eight o'clock that morning libelant Morani and several fellow employees commenced working in the engine room of the AGATHA. Morani was engaged during the morning in drilling holes in overhead beams for brackets which were intended to hold pipes connecting to the engine, and two other employees, Manuel Sanchez and Elmer Gilreath were engaged in similar work. There was no heat in the vessel on this day because neither the main engine nor the auxiliary generator was in operable condition. Power lines had been brought aboard from an on-shore source but were not being used to activate any heating device. The engine room was approximately 20' wide, 20' long, and 12' high. It was separated from the vessel's fish-hold by a wooden bulkhead. The fish-hold was 20' wide, 22' long, and 10' high. The hatch above the fish-hold was approximately 4' x 6' and its cover consisted of three removable sections. On the day in question, one of these three sections had been removed leaving an opening about 2' x 4'.

I find that Frank Tringale, who is Treasurer of Agatha Fisheries, Inc. and the ship's engineer, went aboard the AGATHA at about 8:30 A.M. on the day in question, and without giving notice to the libelant, or to any other officer, agent or employee of Bromfield Corporation, he ignited three metal salamanders in the fish-hold. A salamander is a device used for the burning of charcoal. Each salamander was about 1½' in diameter and about 3' high and stood on metal legs. Each held 50 pounds of charcoal and was open on the top and closed on the bottom save for small air holes. I further find that Tringale put 50 pounds of charcoal into each of the three salamanders before igniting them and left them burning for the purpose of heating and thereby drying-out the four wooden walls (bulkheads) of the fish-hold in order to put these bulkheads in condition to be repainted. I also find that Tringale had lighted similarly loaded salamanders in the fish-hold on approximately seven other occasions prior to the day in question although, due to the holiday season, not necessarily on seven consecutive days immediately prior thereto. At some time between 10:30 and 11:00 A.M., Morani, who was sitting astride a manifold about eight feet above the floor of the engine room, became sick, fainted, and fell to the floor, suffering a scalp laceration and a traumatic injury in the lumbosacral area. Later the same day Manuel Sanchez and Elmer Gilreath became sick while in the engine room and Tringale became sick while in the engineer's quarters which are located immediately astern of the engine room and which open into the engine room.

At the trial, Dr. Richard Ford testified as a medical expert for the libelant. He testified extensively as to the effect of carbon monoxide poisoning on the human body, as to the properties of carbon monoxide gas, as to the fact that he has examined and found carbon monoxide poisoning in persons two stories above a garage in which an automobile engine was left running, and as to the fact that in his opinion carbon monoxide gas because of its tiny molecular structure can penetrate a wooden bulkhead of the type involved herein. He testified that carbon monoxide is produced when carbon-containing fuels are burned under conditions which produce incomplete combustion, i. e., in places where an inadequate supply of oxygen is present. He testified that charcoal is nearly pure carbon and that if there is no free flow of air available there will be voluminous production of carbon monoxide when it is burning. See Alfieri v. Cabot Corp., App. Div., 235 N.Y.S.2d 753.

Dr. Ford explained that the hemoglobin in the blood has an affinity for carbon monoxide some three hundred times its affinity for pure oxygen, and that the presence of carbon monoxide produces a carbon monoxide asphyxia, with the result that the body tissues do not get an adequate supply of oxygen to function freely and unconsciousness results from the blocking of oxygen to the brain. He expressed the opinion that given a source of a large amount of carbon monoxide in a room abutting a place where the four men were working, and given the fact that these four men became ill, and having in mind the complete absence of evidence of any other source of toxic or noxious fumes, these four men were victims of carbon monoxide poisoning.

There was testimony from other witnesses that the bulkhead between the engine room and the fish-hold was watertight and fume-tight, and that it was incumbent upon the owners of the AGATHA to maintain this condition lest water from melting ice in the fish-hold flood the engine room, or lest fumes from the engine room destroy the value of the catch of fish in the fish-hold by contaminating the fish with oily vapors. Various photographs introduced in evidence indicate that in fact there were a number of openings in the bulkhead between the engine room and the fish-hold. Two of these openings were for bilge-pump lines. One was for a fresh water line. Another was for an electrical lead between the rooms. More than a dozen bolts, all of which pass into the wall, are visible in libelant's Exhibit 4, a photograph of the bulkhead taken from the fish-hold.

In the light of the testimony of Dr. Ford, I find that carbon monoxide gas was produced by the three burning salamanders in a sufficiently large quantity to be poisonous to human beings. Having in mind the existence of the apertures in the bulkhead and the fact that some drying-out of the fish-hold to ready its walls for painting had occurred on the day in question and on at least seven other days shortly prior thereto, and having in mind that wood expands when wet and contracts in the drying process, I further find that this carbon monoxide gas passed through some aperture in the bulkhead between the fish-hold and the engine room in sufficient quantity to render sick Sanchez, Gilreath and Tringale, and to cause the libelant Morani to lose consciousness, fall from the place where he was then working in the exercise of due care to the floor of the engine room, and to suffer certain injuries discussed *infra*.

I rule the Tringale was negligent in igniting the salamanders without giving notice of that fact to the other occupants of the vessel. I do not rule that the use of salamanders alone is negligence, in view of the testimony that it was customary in the "Italian fishing fleet," so-called, to use these devices aboard ship. Rather, I rule that it was negligent to use them and to leave them burning for a period of many hours without warning other occupants of the vessel that these salamanders were burning, or without providing adequate ventilation therefor. See Sarna v. American Bosch Magneto Corp., 290 Mass. 340, 343, 195

N.E. 328 (1935); Newlin v. New England Telephone & Tel. Co., 316 Mass. 234, 236, 54 N.E.2d 929, 155 A.L.R. 204 (1944); Deerfoot Farms, Inc. v. The New York, New Haven & Hartford Railroad Co., 327 Mass. 51, 55, 96 N.E.2d 872 (1951).

■ With regard to the claim of respondent Agatha Fisheries, Inc. against the impleaded respondent Bromfield Corporation, I find and rule that the record is devoid of any evidence of negligence on the part of any person for whose conduct Bromfield Corporation is legally liable. Accordingly, I find for the Bromfield Corporation on the claim of Agatha Fisheries, Inc. for indemnity from Bromfield Corporation.

■ Turning to the question of damages, it was testified without contradiction that libelant Liberty Mutual Insurance Company, as workmen's compensation insurer for Bromfield Corporation, has paid libelant Francis Morani the sum of $7883.94 compensation and $1687.35 for medical expenses, or a total payment as of the date of trial of $9571.29 to or for the account of Morani.

Dr. Roger Doyle, Dr. Michael McGarty and Dr. Samuel Levine testified as to examinations and diagnoses they made from time to time of Morani's injuries, and a number of hospital records were introduced in evidence. I find that while Morani received a scalp laceration as a result of his losing consciousness and falling to the floor of the engine room, his most serious injury was to the lumbosacral area of his back. He unquestionably suffered a traumatic injury to this area and it appears clear that while no bones were fractured, damage was done to soft tissue. Many x-rays have been taken of Morani and all of them can be fairly characterized as negative. The same is true of a lumbar myelogram which was taken for the purpose of establishing the existence or nonexistence of a disc rupture or other injury of an allied nature.

Dr. Levine, an orthopedic surgeon who treated the libelant over an extended period of time, expressed the opinion that no disc damage was involved, but that Morani was suffering from tearing of tissue around the lumbosacral joint and from what he called sclerosis to facets of the lumbosacral joint. Basically, Dr. Levine's diagnosis was a severely strained back, which was totally disabling for a substantial period of time but not permanently disabling.

Dr. Doyle, who examined Morani for Liberty Mutual, workmen's compensation insurer, testified that Morani was disabled from the time of the accident until February 6, 1959. He found that most of the common tests and examinations produced negative results. He also found a "considerable functional overlay" present, i. e., that Morani's inability to function normally was in fact impaired although he could find no orthopedic injury or abnormality to adequately explain this functional disturbance. Like Dr. Levine, Dr. Doyle found there was a causal connection between the accident and the inability to function normally. He opined that there was no disc injury present, no nerve injury present, and no physiological injury discoverable. He also testified that he thought a good deal of the spasm he found was voluntary and involved a large mental element.

I find that libelant Morani, who is still wearing an orthopedic belt, has suffered a permanent partial disability, consisting of damage to the tissues in the lumbosacral area, as a result of his fall to the engine room floor. I find that he is not totally disabled, and in view of the fact that in the last few years he has been employed as an automobile washer, polisher and driver, and as a truckdriver for the City of Boston, I find that the extent of his partial disability is less than he would have me believe.

I find that a fair sum to compensate the libelant Morani for his pain and suffering, diminution of earning capacity, medical expenses, including doctors' and hospital bills, and for his probable future pain and suffering and continued diminution of earning capacity, is $30,000. This sum is to be apportioned between the

libelants according to the provisions of 33 U.S.C.A. § 933.

A decree shall be entered for libelants in the amount of $30,000 against Agatha Fisheries, Inc. and dismissing the libel as to Bromfield Corporation.