**PHOENIX INDEMNITY CO. and Joseph Jurisich Marine Service, Inc.,**
**Appellants,**

v.

**Marcus L. GIVENS, Appellee.**

**No. 17403.**

United States Court of Appeals
Fifth Circuit.

Feb. 12, 1959.

Rehearing Denied March 24, 1959.

Richard B. Montgomery, Jr., Henry O'Connor, Peter H. Beer, New Orleans, La., for appellants.

David R. Normann, Normann & Normann, New Orleans, La., for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Marcus Givens worked with his hands. He farmed, logged, and finally succeeded in getting a job as a roustabout in the Venice oil field near the mouth of the Mississippi River. He cannot read or write. Tuesday, April 26, 1955, was to have been an eventful day for him. That Tuesday he was to advance from roustabout to wireline helper and to exchange the insecurity of working in an oil field labor pool for the relative security of regular employment with the California Company.

Thursday afternoon, April 21, 1955, Givens was paid off in Buras, a small town near Venice, Louisiana. He set off in his car for his home in Monticello, Mississippi. The highway between Buras and Empire is a two-lane road eighteen feet wide. At 7:45 p.m., near Empire, travelling south toward Buras, was a tractor-trailer owned by Folse Drayage Company and operated by one of its employees. The trailer was hauling a Link Belt dragline owned by Jurisich Marine Service, Inc. Joseph Meadows, an employee of Jurisich's and a dragline operator, had helped load the dragline on the trailer. He followed in his car to help unload. A dragline is a tall steel crane, sixty feet high (or long, when the boom is lowered), carrying heavy steel lines for dragging, mounted on a cab, the cab in turn mounted on a crawler or tractor. This dragline weighed between 50,000 and 55,000 pounds. It was loaded cross-wise. The tracks of the crawler section (thirteen feet, four inches wide) extended two feet seven inches beyond each side of the trailer platform.

The window on the driver's side of Givens' car was open. He rested his elbow on the window ledge and his hand on the top of the window. Night had settled on the road. There were no lights on the dragline. At a curve in the road Givens passed a police car, then the truck section of the tractor-trailer. Suddenly, before he could swerve to avoid the protruding dragline, the tracks of the crawler scraped across the front of his car, caught his forearm, and tore off his arm above the elbow. The severed arm fell on the road.

Givens sued Folse and its insurer (Highway Insurance Underwriters) and Jurisich and its insurer (Phoenix Indemnity Company). He recovered a verdict of $80,000 against Folse and Jurisich and their insurers. Folse and its insurer did not appeal. Jurisich and Phoenix appealed, contending that the trial court erred: (1) in failing to sustain their motion for a directed verdict and for a judgment notwithstanding the verdict; (2) in not granting a new trial on the ground that the jury's award was excessive; (3) in allowing certain evidence to be introduced. We affirm.

## I.

A. Folse Drayage owned and operated tractor-trailers used in its business of hauling equipment, particularly oil field equipment. The day before the accident Jurisich arranged by telephone for Folse to haul two draglines from a job location near Belle Chasse to Buras. Folse agreed to furnish a tractor-trailer and a driver to haul the equipment, Jurisich to pay $15 an hour for the truck and driver.

Folse Drayage has a certificate as a "common carrier of special commodities over irregular routes", issued by the Louisiana Public Service Commission. Folse applied to the Louisiana Department of Public Safety, Division of State Police for, and was granted, a permit to move "overlength, overwidth" draglines. The permit was granted for "daylight hours only", "red flags to be displayed on load" The permit described the over-

all length as sixty feet, with the front end overhang as twenty feet, the maximum overwidth two feet (an understatement by seven inches) and a gross weight of 64,000 pounds (an understatement by about 20,000 pounds).

The day of the accident Reed Roberson, a negro, drove the tractor-trailer to the location of the draglines. When he arrived, he met Meadows, the white dragline operator for Jurisich. The first dragline was delivered successfully. By the time the second was loaded, it was late enough in the day for both Roberson and Meadows to know that it would have to be hauled at night.

The record shows that Meadows assumed responsibility for the loading. Skids are used to enable a dragline to crawl onto the trailer. Meadows determined where the skids would be placed. Whether the dragline would be loaded crosswise or lengthwise was dependent on the placement of the skids. Joseph Jurisich testified that he gave "instructions" to Meadows "to load the machines * * * [to] track them on up on the trailer". He testified also that Meadows was to unload them * * * [and] to follow the dragline down the highway". Jurisich testified that, "it is customary in his business operations and in the movement of a dragline such as this that [his] operator loads it on the truck."

Folse testified that "normally and customarily when [he would] rent this equipment to Mr. Jurisich for movement of draglines, [the "crane operator", Meadows] determines which way the dragline should be loaded on the crane". Roberson testified that the tractor-trailer had been converted so as to permit the loading of a dragline lengthwise. He put the skids where Mr. Meadows told him to put the skids. "After he told me to load from the side that's the onliest way I put them." Considering the custom between the parties of handling of equipment and the relationship between the negro truck driver and the white dragline operator there is no doubt in our minds that Meadows participated in the loading and assumed such control

that he and his employer must be held responsible for the negligent loading, to the extent it caused the accident.

His responsibility did not come to an end when the truck started to roll. As Jurisich testified, he instructed his dragline operator to follow the loaded trailer and "take the proper precautions to remedy danger * * * even to unload the dragline if necessary". Meadows acknowledged that "it was too late and it was too dangerous for him to proceed" and he claims that he warned Roberson and told him to stop. Roberson contradicted such statements and denied that Meadows told him anything between the time he left Belle Chasse and the scene of the accident. Roberson stuck firmly to his statement: "I have to take orders" from the man "I'm moving the equipment for".

■ B. Appellant argues strongly that Folse, as a common carrier and independent contractor legally could not relinquish responsibility for safe loading and carriage. We view this argument as immaterial to the liability of Jurisich for the negligent acts of its employees. Folse is liable for the acts of Roberson. So too is Jurisich for the independent though concurrent negligence of Meadows. As the record shows, and as the jury must have believed, Meadows was in control of the loading and movement of the draglines. We cannot allow a fine-spun theory to deny the existence of a fact evident almost beyond dispute.

Appellant relies heavily on Fontenot v. National Transfer Co., La.App., 1 Cir., 1957, 99 So.2d 795, 796, for authority that Jurisich by law could not be responsible. All that Fontenot held, however, was that on the facts of that case the transfer company had "complete control of loading, hauling and unloading".[1] That is not this case. Control is a question of fact. Jackson v. Blue, 4 Cir.,

1945, 152 F.2d 67. On the facts, Meadows, acting for his employer and on instructions of his employer, told Roberson how to load the dragline and had sufficient control to have instructed Roberson not to move the dragline until there was light enough to diminish the danger of accident.

C. Appellant argues that assuming that Meadows was negligent in some degree in loading the draglines, such negligence was not the proximate cause of the accident; the proximate cause was the intervening act of Roberson in driving at night.

■■ The appellant confuses proximate cause with sole cause. The fact that some other cause (driving the trailer at night) concurred with Meadows' negligence (in loading the draglines) does not relieve Meadows' employer. There may be two or more coexisting and cooperating forces, each a proximate cause. Morgan Hill Paving Co. v. Fonville, 1928, 218 Ala. 566, 119 So. 610, 622.

As we view this case, Meadows' participation in the loading and movement did not stop at the moment the truck was loaded. He was guilty of continuing negligence from the time he loaded the dragline onto the trailer until the time of the accident. It was within his power, and it was his duty to order Roberson not to move the dangerously loaded trailer when he knew that it could not be delivered during daylight hours. He failed to halt the trip when darkness arrived. At Port Sulphur, after dark, the protruding dragline scraped an automobile passing from the opposite direction. Disregarding this omen, Roberson and Meadows continued on. In the course of their trip they passed at least seven sites suitable for stopping overnight.

■■ Both parties invoke the borrowed servant doctrine.[2] The borrowed

1. "The Atlas Drilling Company", said the Court, "did nothing more in this case than to indicate the machinery to be hauled. The manner and method of loading and hauling rested entirely with the employees of the National Transfer Company, Inc."

2. In Standard Oil Co. v. Anderson, 1908, 212 U.S. 215, 29 S.Ct. 252, 254, 53 L. Ed. 480, the Court stated:

servant doctrine developed in a setting where one employee with two possible masters injures another, and the question is, who was the employer for the purpose of imputing negligence. It has no application where the negligent acts of two employees concur to cause some injury to another.[3] The hard cold facts here are that both Meadows and Roberson were negligent to the point of being irresponsible. Each of their employers should be held liable for the concurrent acts of their irresponsible employees.

In Jackson v. Blue, 4 Cir., 1945, 152 F.2d 67, 71, Blue sued for injuries he received while he was driving a Greyhound bus on a public highway late at night. The bus collided with an overhanging blade of a bulldozer that was being transported on a tractor-trailer. The truck and driver were furnished by a trucking company, Highway Equipment. An organization called the Pool had secured the use of the bulldozer for construction work and had leased the truck and driver from Highway Equipment, and its employees did the loading. There was no groping for the borrowed

> "It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct * * * of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work."

3. In the leading case of Benoit v. Hunt Tool Co., 1951, 219 La. 380, 53 So.2d 137, 140, the Court made an exhaustive study of the doctrine. It supports our conclusion as to the correct application of the doctrine. The Court stated:

servant doctrine. The court held that the Pool and the Highway Equipment were both liable as the joint masters of the driver.

> "[A]t the time of the accident the transportation of the bulldozer was being carried on both for the benefit of the Pool in performance of its obligation and for the benefit of Highway Equipment in the delivery of the machinery to the new lessee at Georgetown."

The driver, said the court, "was acting for both of them in taking the bulldozer to the place where it was needed." Here, we have not only negligence in the movement along the highway at night of the tractor-trailer burdened by a machine of menacing width, we also have the negligent loading of the machine by the shipper's employee. This point was not specifically present in Jackson v. Blue because apparently the court treated the loading by the Pool's employees as inseparable from the manner in which the truck was operated. "When it is borne in mind," the court pointed out, "that the journey was continued after dark, the

> "In determining liability under this doctrine in some cases the courts have imposed liability on the person in whose business the employee was engaged at the time the tort was committed. In others the test has been the right of control over the servant at the time the tort was committed. It has been pointed out that in applying the latter test it is often difficult to decide just what fact or facts constitute control. Mere division of control does not, in itself, raise the presumption of surrender of control, but there is a presumption that the general employer is liable, and it rests upon him to show that, as to the particular work in question, the servant has been lent and is performing only the borrower's work, and that he was not the defendant's servant at all. It has been said that even the control test is not an infallible one, and that the elements of each case must be taken into consideration. Where, however, it is clear that control by the defendant was coupled with performance for the defendant and in the defendant's business, the result is certain."

danger to passing vehicles is obvious. Moreover, the arrangement of the defendants' combination was contrary to the law of Virginia." The decision is significant also, because the question of control over the driver, upon which the case ultimately hinged, was held to be a question of fact for the jury, not a question of law as Jurisich has urged.

■ The case was properly submitted to the jury. "Where as here", we said in Maryland Casualty Co. v. Kador, 5 Cir., 1955, 225 F.2d 120, 121, "the evidence is conflicting or permits of conflicting inferences and the case has been fully and fairly presented to a jury, the verdict will not be disturbed on appeal".

■ Jurisich complains that the verdict of $80,000 is excessive and insists that a new trial should have been ordered, citing cases in which less than $80,000 was awarded for loss of an arm.

■ Damages are within the province of the jury. The trial court has the power, however, to remedy the injustice of an excessive award by ordering a new trial or by insisting on a remittitur as an alternative to a new trial. Wetherbee v. Elgin, Joliet and Eastern Railway Company, 7 Cir., 1951, 191 F.2d 302; Ohio Casualty Ins. Co. v. Brown, 5 Cir., 1957, 241 F.2d 795. This Court may review damages only indirectly, by determining if the trial judge abused his discretion in denying a motion for new trial.

Givens was twenty-eight years old at the time of the accident. He was married and had four children. In view of Givens' illiteracy, a limitation severely circumscribing his job-opportunities and forcing him to rely on his two hands to earn a living, and in view of all the facts, we cannot say that Jurisich has proved that "the verdict is so grossly excessive or monstrous as to demonstrate clearly that the trial court has abused his discretion in permitting it to stand". Hu-

lett v. Brinson, 1955, 97 U.S.App.D.C. 139, 229 F.2d 22, 25, certiorari denied 350 U.S. 1014, 76 S.Ct. 659, 100 L.Ed. 874. See also Reid v. Nelson, 5 Cir., 1946, 154 F.2d 724. In Gillen v. Phoenix Indemnity Co., 5 Cir., 1952, 198 F.2d 147, 150, this Court expressed the opinion that "an instruction (that the jury look to awards by state courts in similar cases) is not compatible with the historic function of the jury in fixing in each case the proper award to be made * * *."

### III.

■ The appellant complains that the trial judge erred in accepting evidence as to the *gross* amount of plaintiff's earnings. The plaintiff is entitled to recover, so the argument runs, only the amount of take home pay he is now earning and presumably would earn. Appellant contends that the Court erred also in allowing an actuary, testifying for the plaintiff, to compute loss of future earnings by discounting earnings based on interest rates of 2½%, 3% and 3½%.

We see no error in the admission of such testimony. Jurisich was free to introduce testimony to contradict or to explain that gross earnings are not synonymous with take home pay.[4] If the defendant felt that money has an earning power of 6%, the defendant should have introduced testimony to support that belief. In United States v. Puscedu, 5 Cir., 1955, 224 F.2d 5, 7, this Court held that the record did not warrant setting aside a judgment as erroneous where the trial court stated that " 'considering the Libellant's lack of education and inability to select proper investments,' * * * 3 per cent, rather than 5 per cent, * * * was proper rate of discount in computing present value of damages for impaired earning capacity."

Judgment is

Affirmed.

---

4. "We think that the trial judge's method of computing libellant's loss of earning power was not erroneous. We see no error in the refusal to make a deduction for income taxes in the estimate of libellant's expected earnings; such deductions are too conjectural." Stokes v. United States, 2 Cir., 1944, 144 F.2d 82, 87.