Maureen A. MONTELLIER, as Administratrix of the goods, chattels and credits of Norman J. Montellier, deceased, Appellee,

v.

UNITED STATES of America, Appellant.

Cal. No. 201, Docket 27650.

United States Court of Appeals Second Circuit.

Argued Jan. 29, 1963.

Decided March 22, 1963.

Sherman L. Cohn, Department of Justice, Washington, D. C. (Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Joseph P. Hoey, U. S. Atty., Alan S. Rosenthal and Lawrence J. Galardi, Attorneys, Department of Justice, on the brief), for appellant.

John S. Chapman, Jr., of Duer & Taylor, New York City (Arthur E. McInerney, New York City, of counsel), for appellee.

Before LUMBARD, Chief Judge, HAYS, Circuit Judge, and DIMOCK, District Judge.

HAYS, Circuit Judge.

Plaintiff, as administratrix, sues under the Federal Tort Claims Act [1] to recover damages for the death of her nusband, Norman J. Montellier, who was killed in an airplane crash at Westover Air Force Base in Massachusetts. The district court awarded plaintiff damages in the amount of $168,000 in a judgment from which the United States appeals. We affirm the judgment.

Montellier, who was a correspondent for United Press International, was invited by the Army Air Force to participate, together with a number of other newspaper representatives, in what was planned as a record breaking series of flights to London and return. The plane on which Montellier was a passenger crashed within thirty seconds of take-off and all aboard were killed instantly.

The district court found that the fatal crash resulted from the negligence of those in charge of the flight, in that (1) the pilot took off with wing flaps set at 40 degrees, (2) an unqualified person occupied one of the pilots' seats in the cockpit and (3) the plane was mishandled after take-off. Since we are persuaded that there is sufficient evidence to support the district court's finding as to the first of these specifications (Fed. R.Civ.P. 52(a)), we find it unnecessary to consider the second and third specifications.

There are a number of principles of aerodynamics which are thought to have a bearing on the causes of the accident. They are ably described and discussed in the opinion of the district court. 202 F.Supp. 384. It is sufficient here to point out briefly the function of the wing flaps of a plane.

Flaps are used to enlarge the area of the wings and thus to provide greater lift capacity at lower speeds. They are used at take-off and landing where lower speeds are required by reason of the

---

1. 28 U.S.C. § 1346(b):

"(b) Subject to the provisions of chapter 171 of this title, the district courts, * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 2674:

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

"If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof."

limited length of the runways. Once the plane is airborne the flaps create drag and the greater the flap extension the greater the drag. Drag reduces the capacity of the plane to attain altitude and the flaps are therefore retracted as soon after take-off as is safely possible.

There is no dispute that the flaps were set for 40 degrees for the flight in question. The issue is whether this flap extension constituted negligence.

The evidence which we find sufficient to support the district court's determination showed that:

No plane of the type on which Montellier was to fly had ever before taken off from the air field at Westover with flaps at 40 degrees, nor had the use of such flaps ever been tested there.

The manual with which the pilot, Colonel Broutsas, was provided called for the use of 20 degree and 30 degree flaps for take-off and for 40 degree flaps for landings. As the district court said, "Several of the charts in the manual (including climb-out) gave no data for 40 degree flaps." 202 F.Supp. at 410.

The manual warned, however, that high flap settings would reduce climb-out performance. It stated that the "urgency of some missions may demand a reduction in the level of safety during take-off" and thus justify the use of higher flap settings. (There was, of course, no urgency in respect to Colonel Broutsas' mission.) The manual advised that the "smallest flap setting consistent with the available field length should be used".

Colonel Broutsas had never experimented with 40 degree flaps nor had any other flight officer. Broutsas had an understanding with his wing commander that 40 degree flaps would not be used.

One of the government's experts testified that, "pending tests," Broutsas should not have taken off with 40 degree flaps. Broutsas' instructions for the flight in question provided that no new or unusual procedures were to be employed. Safety was to "receive priority above all other considerations".

The pre-flight briefings were all based upon the use of 30 degree flaps. The performance engineer computed all take-off data on the basis of 30 degree flaps. He testified that he would have been "concerned" if he had known that Broutsas intended to use 40 degree flaps.

About an hour and a half before the time scheduled for take-off Broutsas had a telephone conversation with someone whom he addressed as "Sir". According to Broutsas' account to a fellow officer, this person, apparently a superior officer, sought to persuade him to delay the take-off an hour, presumably to wait for an anticipated drop in temperature which would have made the take-off easier. Broutsas expressed satisfaction that he had "talked him out of that one." At this point, the other officer who had been present during the telephone conversation asked whether using 40 degree flaps was not "kind of tricky." Broutsas replied that it was not recommended, but that "once he got it off and got it cleaned up and everything it would be okay."

A few minutes later, Broutsas spoke with his Deputy Wing Commander, Colonel Burrell. Burrell expressed concern over the rising temperature and told Broutsas that if the temperature went higher, he should reduce his weight by burning off part of his excess fuel reserve prior to take-off. Broutsas did not request permission to use 40 degree flaps nor inform his superior that he planned to do so.

Some time later Broutsas suggested to Captain McDonald, the pilot of another craft, that McDonald also use 40 degree flaps. McDonald's plane had the same gross weight as Broutsas'. McDonald informed Broutsas that he intended to use 30 degree flap settings.

The two planes which were scheduled to precede Broutsas' flight took off without mishap at midnight and 12:15 a. m. respectively using 30 degree flaps. The gross weight of each of these planes was some 50,000 pounds less than Broutsas' plane. However, unlike these first two flights, Broutsas' plane was equipped

with water augmentation. The effect of water augmentation was to render the heavier plane approximately equivalent to the lighter planes in climbing potential. Broutsas was aware that the two earlier flights had taken off safely with flaps set at 30 degrees.

At 12:30 a. m., the time scheduled for Broutsas' take-off, the temperature was still high. There was no urgency requiring that the take-off schedule be rigidly adhered to. One officer had urged Broutsas to wait for the anticipated cold front. Another had told him to burn off part of his unneeded reserve fuel so as to reduce gross weight. Broutsas rejected both suggestions.

Although no flight officer had ever tried 40 degree flaps, although the flight manual did not contain complete calculations based on forty degree flaps, although the briefings specified 30 degree flaps, and the performance engineer's computations were based on that setting, Broutsas, contrary to his agreement with his Wing Commander and to his flight instructions, without informing his superior officers of his intentions, and with full knowledge that two planes had already taken off safely with 30 degree flaps, set his flaps at 40 degrees for his take-off. We cannot say the trial court was in error in reaching the conclusion that in doing so Broutsas was negligent.

Nor do we find error in the trial court's determination that this negligence was a proximate cause of the accident.

The difficulties of take-off with 40 degree flaps were established by Air Force heavy weight take-off performance tests of the same type of plane conducted after the accident. The report of the test results concludes:

"The aircraft can be flown safely at heavy weights using 40 degree flaps, but this setting is not recommended for take-off. The technique required to obtain optimum performance is much more critical than with 30 degree flaps, and a small variation from the recommended technique will considerably increase take-off ground roll. The pilot can initiate gear retraction earlier with 30 degree flaps since it is easier to tell when the aircraft is airborne. In addition, the initial climb performance at heavy gross weight with 40 degree flaps is considerably less than that with 30 degree flaps.

"There is no advantage in using 40 degree flaps for heavy weight take-offs. Take-off distances using the recommended take-off speeds presented in the Flight Handbook can be attained using 30 degree flaps; however, the distance shown for 40 degree flaps are 100 to 500 feet optimistic for weights ranging from 240,000 pounds to 297,000 pounds. The total distances to clear a 50 foot obstacle are optimistic for both flap settings and all gross weights tested. For gross weights ranging from 260,000 to 297,000 pounds, the actual total distances over a 50 foot obstacle corrected to sea level standard day conditions are from 1800 to 2900 feet longer than handbook values for 40 degree flaps and from 500 to 100 feet for 30 degree flaps. The use of 40 degree flaps for take-off at gross weights above 260,000 pounds results in longer ground rolls and total distances to 50 feet than the distances obtained using 30 degree flaps."

The report recommends that:

"1. The aircraft not * * * be flown using 40 degree flaps for take-off and all references in the Flight Handbook to this operation be deleted."

It appears, then, that during take-off, and particularly during the moments immediately following lift-off from the runway, Col. Broutsas' plane could not have performed as expected. Broutsas thought he had shortened his ground roll by using 40 degree flaps, when in fact he had lengthened it. He thought he would reach 50 foot altitude shortly after passing over the end of the runway, when in fact he could not reach that altitude for at least another 1800 feet.

It is, of course, impossible to determine Broutsas' reaction when he observed his plane performing in this unexpected manner. However, the Air Force investigation of the crash showed that some time after reaching its highest altitude of 60 feet above the tree tops, the plane assumed a four degree descent angle and continued in its descending path until it crashed. The investigators concluded that there was no mechanical defect in the plane prior to the crash. The likelihood is overwhelming, then, that the plane assumed its descending path because of some action taken by Broutsas in response to its unexpected performance. Whether this descending path was assumed intentionally in order to gain airspeed, or inadvertently because Broutsas was over-concentrating on the airspeed indicator or some other instruments is of no importance. It is enough that the 40 degree flaps caused the plane to perform abnormally, that in all probability Broutsas responded to this abnormal performance by acting in a manner which caused the plane to assume its four degree descent path, and that this descent resulted in the crash. The proximate cause of the accident and of Montellier's death may thus be directly traced to Broutsas' negligence in using 40 degree flaps for the take-off.

Before beginning his flight Montellier signed a release [2] in which he purported, on behalf of himself and his heirs, executors and administrators, to "release and forever discharge the Government of the United States and all its officers, agents and employees, acting officially or otherwise, from any and all claims, demands, actions, or causes of action, on account of my death * * * which may occur from any cause during said flight * * * as well as all ground and flight operations incident thereto."

Under Massachusetts law, this document was, for reasons that will shortly appear, ineffective to bar the administratrix' action for wrongful death. Wall v. Massachusetts Northeastern St. Ry., 229 Mass. 506, 118 N.E. 864 (1918). The Government contends, however, that the effect of the release is to be determined according to federal law, and that under federal law the action is barred. As we do not agree with the first contention, we do not reach the second.

■ The Government first contends that the release was a contract between Montellier and the United States, and that the validity and effect of a contract between the United States and one of its citizens is to be determined by federal law. This argument overlooks the express provision of the Federal Tort Claims Act, which gives the district courts jurisdiction of actions for injury or death caused by an employee of the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place

2.                   "RELEASE
(Reference AFR 76–6)
Westover AFB Mass.
Place
26 June 1958
(Date)

"KNOW ALL MEN BY THESE PRESENTS: WHEREBY *I Norman Montellier* am about to take a flight or flights as a passenger in certain Army, Navy, and/or Air Force aircraft on 26, 27 June 1958; and whereas I am doing so entirely upon my own initiative, risk, and responsibility; now, therefore, in consideration of the permission extended to me by the United States, through its officers and agents to take said flight or flights, I do hereby, for myself, my heirs, executors, and administrators, remiss, release and forever discharge the Government of the United States and all its officers, agents, and employees, acting officially or otherwise, from any and all claims, demands, actions, or causes of action, on account of my death or on account of any injury to me or my property which may occur from any cause during said flight or flights or continuances ther[e]of, as well as all ground and flight operations incident thereto. I did not receive formal training in altitude indoctrination; however, I have been thoroughly briefed on use of the equipment necessary for high altitude flight, as well as possible effects of such flights. I fully understand that I am waiving altitude indoctrination.

            "/S/ NORMAN J. MONTELLIER
               (Signature)"

where the act or omission occurred" 28 U.S.C. § 1346(b). As we held in Rushford v. United States, 204 F.2d 831, 832 (2d Cir., 1953):

"[I]t is plain that Congress meant to make the proper state law in all respects the model for the liabilities it consented to accept; and that the 'circumstances' included as much those facts that would release a liability once arisen, as those on which its creation depended."

Accord, Matland v. United States, 285 F.2d 752 (3d Cir., 1961); Air Transport Associates, Inc. v. United States, 221 F.2d 467, 471 (9th Cir., 1955). See also United States v. Massachusetts Bonding & Ins. Co., 227 F.2d 385, 391 (1st Cir., 1955) (dictum), reversed on other grounds, 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956).

■ As was recently pointed out by the Supreme Court, the purpose of the Tort Claims Act was "to render the Government liable in tort as a private individual would be under like circumstances." Richards v. United States, 369 U.S. 1, 6, 82 S.Ct. 585, 589, 7 L.Ed.2d 492 (1962). Under the circumstances here presented, the decedent's release would not have immunized a private individual from suit by the administratrix. The government is in no better position.

The government's next argument is based on the penal nature of the damages clause of the Massachusetts statute,[3] and on the direction in 28 U.S.C. § 2674 that if the law of the place of the act or omission complained of provides "for damages only punitive in nature, the United States shall be liable for actual or compensatory damages * * * in lieu thereof." In sum, the government argues that the invalidity of the release results from the penal nature of the Massachusetts statute, and that application of the rule against the United States is therefore precluded by 28 U.S.C. § 2674.

■ The Federal Tort Claims Act precludes the application of local law to claims against the United States only to the extent that local law provides for punitive *damages*.

"The solution that Congress chose was (a) the adoption of the local law —*whether punitive or compensatory* —to determine the existence of liability of the United States, and (b) the substitution of 'compensatory' for 'punitive' damages where local law provides only the latter."

Massachusetts Bonding & Ins. Co. v. United States, 352 U.S. 128, 134, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956) (emphasis supplied). As the effectiveness of the release clearly goes to "the existence of liability of the United States," it is immaterial whether or not the Massachusetts rule stems from the asserted penal nature of the statute.

It is clear that the release is ineffective under Massachusetts law. The Massachusetts statute creates a new civil cause of action in the decedent's next of kin. The decedent could not release this potential cause of action because it did not belong to him.

" * * * The action for death did not accrue to the deceased during her life. It is a penalty imposed for her death. It is a cause of action over which the deceased has no control.

---

3. Mass.Ann.Laws ch. 229, § 2C (1955):
"Except as provided in sections one, two and two A, a person who by his negligence or by his wilful, wanton or reckless act, or by the negligence or wilful, wanton or reckless act of his agents or servants while engaged in his business, causes the death of a person in the exercise of due care, who is not in his employment or service, shall be liable in damages in the sum of not less than two thousand nor more than twenty thousand dollars, to be assessed with reference to the degree of his culpability or of that of his agents or servants, to be recovered in an action of tort, commenced, except as provided by sections four and ten of chapter two hundred and sixty, within two years after the injury which caused the death by the executor or administrator of the deceased, to be distributed as provided in section one."

It does not accrue for the benefit of her estate. Although the penalty will be paid to her executrix, it will be received as trustee for her next of kin and not for the creditors of her estate. * * * In case of recovery the executor or administrator receives the penalty for death in a different capacity from that in which he would receive damages for conscious suffering. The release given by the deceased does not bar recovery in this action for death. * * * Different conclusions may be reached in states where the death statutes follow the compensatory principle of Lord Campbell's Act rather than the penalty principle of our statutes." Wall v. Massachusetts Northeastern St. Ry., 229 Mass. 506, 118 N.E. 864 (1918). See also Oliveria v. Oliveria, 305 Mass. 297, 25 N.E.2d 766 (1940). Decisions from jurisdictions in which the statutes permit recovery only if the decedent could have recovered had he lived [4] are inapposite.

■ Finally, the government urges that the trial court erred in its computation of damages by failing to deduct from the decedent's projected gross income the income taxes he would have been required to pay. It would not have been erroneous, under the rule of McWeeney v. New York, N. H. & H. R. R., 282 F.2d 34, 39 (2d Cir., en banc), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), for the trial judge to have made a deduction for income taxes, which would have amounted to a substantial sum in this case. However, Montellier's potential earnings were not so clearly above the "middle reach of the income scale" that it was erroneous not to make such a deduction. As we indicated in McWeeney, no precise line can be drawn.

Affirmed.

DIMOCK, District Judge

I concur in the result.

4. Subsequent to this accident, the Massachusetts statute was amended to so provide. Mass.Ann.Laws ch. 229, § 2 (Supp. 1962).