Johnny F. BLUE, Plaintiff-Appellant,

v.

The WESTERN RAILWAY OF ALA-BAMA, Defendant-Appellee.

No. 71-2289.

United States Court of Appeals,
Fifth Circuit.

Nov. 21, 1972.

W. Eugene Rutledge, Birmingham, Ala., for plaintiff-appellant.

M. R. Nachman, Jr., Montgomery, Ala., for defendant-appellee.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Johnny F. Blue (Blue) brought suit against the Western Railway of Alabama (Western) pursuant to the provisions of the Federal Employers' Liability Act, Title 45, United States Code, Section 51,[1] and the Federal Safety Appliance Act, Title 45, United States Code, Section 11,[2] seeking damages for personal injuries he sustained on June 26, 1970 while serving as a member of a Western switching crew in the Chester Yards at Montgomery, Alabama. The jury returned a verdict for Blue in the amount of $76,780,00. Dissatisfied with the amount of the award, Blue appeals from the judgment entered below assigning errors on the part of the district court in the exclusion of evidence and in its jury instructions. He seeks a new trial limited to the issue of damages. We reverse the judgment of the district court and remand for a new trial on all issues, liability as well as damages.

## THE FACTS

On June 26, 1970, Blue was a member of a switching crew which was engaged in switching cars in the Chester Yards. He was working in the capacity of a "long field" man and his duties were to line switches out in the field so that when cars were cut loose from the train which was being disassembled they could be shunted onto tracks in accordance with a switching list which was in the possession of each crew member. Just prior to the accident which gave rise to this litigation, Blue was stationed at Switch No. 6. He had aligned this

1. Title 45, U.S.C., Section 51:

   "Liability of common carriers by railroad, in interstate or foreign commerce, for injuries to employees from negligence; definition of employees

   Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia or any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

   "Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter."

2. Title 45, U.S.C., Section 11:

   "Safety appliances required for each car; when hand brakes may be omitted

   It shall be unlawful for any common carrier subject to the provisions of sections 11 to 16 of this title to haul, or permit to be hauled or used on its line, any car subject to the provisions of said sections not equipped with appliances provided for in said sections, to wit: All cars must be equipped with secure sill steps and efficient hand brakes; all cars requiring secure ladders and secure running boards shall be equipped with such ladders and running boards, and all cars having ladders shall also be equipped with secure handholds or grab irons on their roofs at the tops of such ladders: Provided, That in the loading and hauling of long commodities, requiring more than one car, the hand brakes may be omitted on all save one of the cars while they are thus combined for such purpose."

switch so that three hopper cars which the engineer was to "kick" down the lead track would go into Track No. 6. The three hopper cars were dispatched by the engineer and when they passed Switch No. 6, Blue threw the switch so that the next car scheduled to travel down the lead track would proceed past Switch No. 6 until it reached Switch No. 10, which had been set for shunting.

It appears from the evidence that Blue threw Switch No. 6 before ascertaining that the three hopper cars had cleared it. After throwing the switch he walked away toward Track No. 22 with his back to the lead track and to the succeeding switching movement. Simultaneously, the next car, loaded wood rack No. 16557, was sent down the lead track from a point several hundred feet west of Switch No. 6  While walking towards Track No. 22, Blue turned around and saw that the west end of the three hopper cars which had been shunted onto Track No. 6 had not completely cleared the lead track and that the wood rack car was heading toward a collision with the last hopper car. Rather than proceeding to Switch No. 6 and realigning it for Track No. 6 (so that the wood rack car could couple with the hopper car on impact), Blue ran to the wood rack car and jumped on it while it was moving at a speed of approximately five miles per hour. He climbed the ladder at the east end of the wood rack car where the hand brake was located, reached the platform adjacent to the hand brake, and applied the brake. Blue was unable to stop the wood rack car before it collided with the west end of the hopper car which was protruding from Track No. 6 onto the lead track. Blue was seriously injured in the ensuing collision between the two cars.

## THE COMPLAINT

Blue's complaint set forth two counts as bases for recovery. The first count alleged a cause of action under the Federal Employers Liability Act (FELA), Footnote 1, supra, and charged that Blue had sustained serious personal injuries:

" . . . as a proximate result, in whole or in part, of the negligence of the officers, agents, or employees of the defendant while acting within the line and scope of their employment by the defendant or by reason of a defect or insufficiency due to the negligence of the defendant, its cars, engines, appliances, machinery, track, roadbed, works or other equipment."

The second count pleaded a cause of action under the Federal Safety Appliance Act (FSAA), Footnote 2, supra. It incorporated the allegations of negligence under the first count, and continued:

"Plaintiff avers that he was caused to sustain and suffer all of his aforesaid injuries and damages as a proximate result, in whole or in part, of the defendant hauling or permitting to be hauled or used on its line of railroad the aforesaid railroad car upon which plaintiff was riding as aforesaid that was equipped with an inefficient hand brake in violation of the aforesaid Federal Safety Appliance Act generally known as the 'Hand Brake Act', namely Title 45, U.S.C.A., Section 11."

## THE ANSWER

In response to the complaint, Western interposed defenses based upon the alleged negligence of Blue.[3] Under the

3. Title 45, U.S.Code, Section 53, provided:
"Contributory negligence; diminution of damages
In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees

statute, although the contributory negligence of Blue was only a pro tanto defense to the claim for damages, Western by its answer pleaded separate defenses: (a) Blue's contributory negligence, and (b) that Blue's negligence was the *sole* proximate cause of the accident warranting the denial of any recovery.

Western charged that the accident would not have occurred had Blue remained at Switch No. 6 until he was sure that the three hopper cars had cleared the lead track, that it was his duty as the "long field" man to remain at the switch until the hopper cars were completely on Track No. 6, and that had he performed his prescribed duties he would have been able to turn Switch No. 6 back and thereby shunt the wood rack car onto Track No. 6 where it would have coupled on impact with the last hopper car. In addition, Western asserted that Blue, having failed to do his duty in the first place, could still have returned to Switch No. 6 after he saw that one of the hopper cars protruded onto the lead track and operated Switch No. 6 without danger. Instead, according to Western, Blue chose the most dangerous course of action possible under the circumstances: he boarded the moving wood rack car and attempted to halt its progress before it made contact with the protruding hopper car. Finally, under Western's contentions, Blue could have jumped from the wood rack car to the ground prior to the impact when he became aware that he did not have enough time and space for stopping the moving loaded car with a hand brake.[4]

### THE TRIAL

Dr. John F. Vallery, Jr., an Associate Professor of Economics at the University of Alabama, testified as an expert witness for Blue. Dr. Vallery was asked to compute Blue's average monthly income for a thirty-month period during the years 1968 through 1970 based upon his gross monthly earnings during that period. The following discussion ensued:

"Q. (By Mr. Rutledge, counsel for Blue): Doctor, have you, based on the earnings that I gave you in 1968, '69, and '70, computed the average monthly income over that period of some thirty months, 1968, '69, and 70?

A. My computations were in average annual salary, which was eleven thousand, four hundred and thirty-three dollars. That is approximately a thousand dollars a month.

MR. NACHMAN (counsel for Western): We object to that testimony, your honor, and move to exclude it. There is no testimony in the record to support what Dr. Vallery just assumed, and it is contrary to the hypothetical question which counsel posed to him with regard to the earnings.

THE COURT: Are you talking about gross?

WITNESS: Yes, sir.

THE COURT: I sustain it, it will be excluded.

Q. Doctor, do you have a pencil and paper there with you?

A. Yes, sir.

Q. Would you make the calculation as to net earnings for 1968, subtracting nine thousand—subtracting one thousand, twenty-three dollars from nine thousand, seven hundred and seventy-five dollars?

A. Eight thousand, seven hundred fifty-two dollars, sir.

MR. NACHMAN: Your honor, we—

contributed to the injury or death of such employee."

4. Western also defended upon the basis that the hand brake was not defective in any respect. Under the proviso to

Title 45, U.S.C., Section 53, supra at Footnote 3, of course, contributory negligence is not available as a defense in an action brought under the Safety Appliance Act.

MR. RUTLEDGE: You want me to take off more than income tax?

MR. BYARS: Yes, sir.

MR. NACHMAN: Yes; there are other deductions.

MR. RUTLEDGE: It is contrary to my understanding your honor, as to—

THE COURT: No; if you are going to get to net, whatever the net is, I don't know what other deductions there may be, but we are interested in net; and if there are other things to take off to get to net, then you are required to do it." (Appendix, pages 152–153)

Later in the course of Dr. Vallery's direct testimony, the following exchange took place:

"Q. Now, Doctor, going back to the figures which I gave you originally which were the gross figures without the mentioned deductions, that is the amount of earnings; have you computed the average monthly earnings based on the gross figures?

MR. NACHMAN: Object again.

THE COURT: I sustain it.

MR. RUTLEDGE: May I—

THE COURT: I will let you make your record at the next recess.

MR. RUTLEDGE: May I explain my position? It is our position, your honor, that the tax situation as of the time that these various returns were filed may or may not be the same.

THE COURT: Well, the income may or may not be the same, too.

MR. RUTLEDGE: That—that is correct, your honor; and what I wanted to do was to give the jury both the net and the gross so that they may make their judgment as to—

THE COURT: I sustain objection.

MR. RUTLEDGE: Thank you, your honor.

THE COURT: On testimony based on gross.

MR. RUTLEDGE: All right, sir.

THE COURT: To the extent that it may be material to any verdict that you might request the jury to return in the case." (Appendix, pages 155–156)

On direct examination, Dr. Vallery testified that, in his opinion, the interest rate available on safely invested funds over the period of Blue's work life expectancy would be 5.5% per year. Dr. Vallery, on cross-examination, acknowledged that high grade corporate bonds were yielding returns in excess of eight percent per year. On redirect examination, Dr. Vallery stated that the then current interest rates were at a 100 year high.[5]

At the conclusion of the evidence, the district judge charged the jury with respect to net earnings as follows:

"Now, one of the items of damages claimed by the plaintiff is compensation for wages lost from his employment by the railroad company, or any other employment, as a proximate consequence, in whole or in part, of the accident on June 26, 1970. The parties have introduced evidence as to the amount of wages earned by Blue for various periods preceding this June 26, 1970, date. You may consider this evidence in determining the amount of *net* wages, if any, that Blue lost as a proximate consequence, in whole or in part, of the injuries suffered in this accident on June 26, 1970. Now, I tell you that you are not bound by that evidence. It is your duty to determine the amount of wages lost, *net* wages lost, by Blue and to compensate him for that loss if you are reasonably satisfied that he's entitled to recover." (Emphasis supplied)

As to the appropriate discount rate to be applied to determine the present value of

5. The verdict was returned May 12, 1971.

an award for lost future earnings, the district court instructed the jury in the following terms:

"If you make an award in this case, and if a portion of your award is based upon loss of future earnings, then you must determine from the evidence in this case these things: What the plaintiff, Blue's, future normal earning power would have been if he had not suffered any injury; what Blue's reasonable work life expectancy would have been; the degree or percentage of Blue's partial disability proximately resulting from the defendant's fault, if any, and the consequent impairment to Blue's future earning power from such disability; and the appropriate reduction to present cash value of the amount of such loss of future earnings, if any, based upon a rate of interest which you fix as reasonable and right according to the evidence in this case. In fixing the amount of such reduction, you must do so upon *the basis of what the earning power of money would be at this time and place* upon investments in safe securities by someone of plaintiff's financial experience and skill." (Emphasis supplied)

## THE CONTENTIONS ON APPEAL

On appeal, Blue asks that a new trial be awarded as to damages only, retaining the trial jury's determination as to liability. In this quest for a new trial, Blue argues that the district court erred in the following respects: (1) the jury was not permitted to consider the history of Blue's gross earnings; (2) the jury was instructed to consider and compute only the amount of net wages lost by Blue as a proximate result of the defendant's breach of duty; and (3) the jury was instructed to reduce its award for lost future earnings to its present value by applying the rate of interest in safe securities then and there in effect.

## GROSS VERSUS NET EARNINGS

Professors Harper and James, in discussing the impact of the Internal Revenue Code's exemption from federal taxation of damages awards received for personal injuries or sickness, Title 26, U.S.Code, Section 104(a)(2), observe:

"The Internal Revenue Code lists as an exemption from gross income 'The amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness . . . .' Thus all compensatory damages in personal injury accident cases are tax exempt though they often include compensation for loss of past and estimated future earnings which would have been taxable if plaintiff had not been injured and had been paid wages or salary. It has been suggested that 'the treatment of lost earnings is rooted in emotional and traditional, rather than logical, factors'. We shall not here try to weigh the wisdom of the exemption. Rather we shall take the exemption as our starting point and try to see how it does and how it should affect the assessment of damages.

"The first question is this: should the probable gross earnings, or estimated net income after taxes, be taken as the measure of recovery for loss of earnings? The argument for computing damages on estimated income after taxes is a clear one: this will measure the actual loss. If plaintiff gets, in tax free damages, an amount on which he would have had to pay taxes if he had gotten it as wages, then plaintiff is getting more than he lost.

"Not many decisions explicitly treat this question. Most of those that do consider it refuse to deduct taxes on the ground that future tax rates and the way they may affect this particular plaintiff are to speculative. It has also been suggested that the tort-feasor ought not to get the benefit of this exemption which comes from a 'collateral source' but this argument overlooks the compensatory theory of damages. It is more forthright to say, as the Missouri court has, that the rule of compensation here must

yield to the practical difficulty of making a forecast.

"Even in this form the argument is weak. In the first place it has no proper application to damages for *past* losses. In measuring them the tax can be computed and should be deducted. Moreover future taxes are no more speculative than many other items that go into prophecies about future losses in this uncertain world of ours—witness the future earnings of a young child or the future trends of the dollar's value. As long as our system stays wedded to the single lump sum recovery, our courts simply have to speculate about the uncertainties of the future. With anything as sure as 'death and taxes', the courts are avoiding their responsibilities when they decline to make the best guess they can, once all the reasonably available evidence has been brought before them. It is noteworthy that the British House of Lords has recently held that damages for past and prospective earnings should be based on estimated net income after taxes." "The Law of Torts", Harper and James, § 25.12, pages 1326–1327.

The leading theoretical exposition of the merits of not restricting the jury to a computation of the plaintiff's net earnings (after taxes) appears in Judge Friendly's opinion for the Second Circuit in McWeeney v. New York, New Haven, and Hartford Railroad Company, 2 Cir. 1960, 282 F.2d 34, 36–39, cert. denied 1960, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93:

"The instruction here requested and refused illustrates the delusive simplicity with which the subject has been invested. Defendant wished the jury to be told merely that 'If your verdict is in favor of plaintiff, you must calculate any past or future loss of earnings on the basis of his net income after deduction of income taxes.' All of us agree the jury needs more guidance than that. But what is the alternative? The trial court could begin by instructing that under the optional tax provided in § 3 of the Internal Revenue Code, which McWeeney was entitled to elect, the tax on a bachelor's income of $4,800 would have been $773. This is still simple enough but the jury must determine not what McWeeney's tax on $4,800 now is but what it would be over his expectancy. In these lower brackets the amount of the tax and its percentage relation to earnings are enormously affected by the number of exemptions. The simple act of matrimony, coupled with the filing of a joint return, would reduce McWeeney's tax from $773 to $620. Is the jury to consider the likelihood of this not unusual occurrence? If the lady brought two children with her, or if these were produced in the ordinary way, the tax would be cut in half, to $380. Each additional child would bring a further tax saving of $110, so that a total of five would make the tax nominal. While such fecundity might be unlikely in a plaintiff of 39 the rule here framed for McWeeney must apply to men who evidence greater interest in marriage and parenthood, and the rise in the birth rate is a phenomenon of our age. Is the jury in each case to speculate, or hear testimony, on the procreative proclivities and potentialities of the plaintiff and his spouse? Moreover, children are by no means the only source of exemptions; § 152 of the Code lists nine other categories. Nor will it do to say that this is over-refinement. If a defendant claims that a plaintiff in these brackets would have had to pay 20% of his income in taxes, the court cannot deprive the plaintiff of an opportunity of showing that he would not have paid anything of the kind, and once the rule were adopted, we see no way of eliminating the question of potential babies and the exemptions they trail with them.

"Having duly instructed the jury how to estimate the number of plaintiff's probable exemptions, and the dates when these will come into being, and on rate brackets and deductions, and the treatment of other income of the plaintiff not affected by the accident, the court would necessarily encounter another

problem. Even the best designed instruction that stopped at that point would be unfair to the plaintiff. This is because, as proponents of the instruction recognize, the product of plaintiff's lost earning power ex-tax and his expectancy will have been discounted to produce 'that sum of money which if invested at a fair rate of return will yield annually the amount by which the plaintiff's earning capacity has been lessened and which will at the time of end of the plaintiff's life expectancy be reduced to zero. This takes into account the fact that money earns interest each year; and it should be remembered that this interest is taxable. Therefore, if a court is going to use income after taxes as a measure of plaintiff's loss, it must add back the taxes which would be due on the interest earned—else the award would not fully compensate for the loss.'

"All this is simple enough to state but how is the jury to apply it? If we suppose that plaintiff would purchase an annuity with the lump-sum previously determined, it will hardly help the jury to be told, in the language of § 72(b) of the Internal Revenue Code, that 'Gross income does not include that part of any amount received as an annuity under an annuity, endowment, or life insurance contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected returned under the contract (as of such date).' Of course the court could itself calculate the exclusion ratio and charge what proportion of the annual payments would be taxable, thus leaving to the jury only the task of determining the amount of each annual payment that would be taxable, the tax thereon, and the discounted amount of the sum of such tax payments, and adding this to the ex-tax award. But here a new complication seems to arise. For a portion of the periodic payments on this sum, which is to be added to fund plaintiff's tax liability, would itself be subject to tax.

"It is answered that, however, unrealistic it may be to suppose that a jury could properly make the series of calculations required, the worst result from giving an instruction would be better than the best result from not giving one. This ignores that, by imposing on the jury a task that the jury cannot reasonably be expected to perform, we would be likely to impair the quality of its performance in areas of its true competence. It ignores also that although failure to instruct the jury to reduce a verdict to take account of income taxes on plaintiff's lost earning power, when viewed in isolation, may tend to make verdicts too high, there are at least two other factors that countervail this in the ordinary case.

"The first is inflation. Though some courts have sanctioned instructions permitting the jury to take into account inflation between the injury and the trial, there is little or no authority in favor of charging the jury to take future inflation into account, see 2 Harper and James, The Law of Torts, § 25.11 (1956). Yet there are few who do not regard some degree of continuing inflation as here to stay and would be willing to translate their own earning power into a fixed annuity, and it is scarcely to be expected that the average personal injury plaintiff will have the acumen to find investments that are proof against both inflation and depression—a task formidable for the most expert investor. The effect of inflation of 1% a year over McWeeney's 29-year expectancy at trial would go a long way toward offsetting any excess in the verdict due to failure to deduct income tax.

"The second offsetting factor is that the supposedly overcompensated plaintiff does not retain his entire recovery or anything like it. Whatever the reasons of history or policy for the American practice of generally not awarding attorneys' fees to the successful party, see Goodhart, Costs, 38 Yale L.J. 849, 872–78 (1929), we can hardly shut our eyes to this when asked to require the jury to take another extrinsic factor into account—particularly when we know that even court-prescribed maxi-

mum scales of contingent fees, which have been attacked by counsel as inadequate, provide either a sliding scale ranging from 50% down to 25% or a flat amount of 33⅓% N.Y.App.Div. 1st Dept., Special Rules Regulating the Conduct of Attorneys and Counsellors at Law, Rule 4.

"There may be cases where failure to make some adjustment for the portion of a plaintiff's or decedent's earnings that would have been taken by income taxes would produce an improper result; but these are at the opposite end of the income spectrum from McWeeney's. For example, if a plaintiff or a plaintiff's decedent, had potential earnings of $100,000 a year, more than half of which would have been consumed by income taxes, an award of damages based on gross earnings would be plainly excessive even after taking full account of the countervailing factors we have mentioned. We find it hard to believe that juries would render such a verdict even in the absence of instruction; but in this limited class of cases the court may properly give some charge or, perhaps better, use the tools provided by Fed.R. Civ.Proc. 49, and an excessive verdict may always be set aside. In such cases, which in proportion are relatively few, the criticism that the whole process of computation is unrealistic has a considerable measure of validity, the projection of future income at such levels being itself extremely conjectural and the slope of the tax progression curve declines although only after having reached such a high plateau that earnings above it have relatively slight value. Such cases are in sharp contrast to the great mass of litigation at the lower or middle reach of the income scale, where future income is fairly predictable, added exemptions or deductions drastically affect the tax and, for the reasons indicated, the plaintiff is almost certain to be undercompensated for loss of earning power in any event. To be sure a practice of refusing the instruction in most cases but requiring some adjustment in a few lacks precision and elegance; but we cannot disregard the practicalities of judicial administration and 'the law is untidy as life with which it deals.' Just where the line should be drawn must be left, as so much is, to the good sense of trial judges, whether acting with a jury or without. Certainly the line was not approached here." (Footnotes omitted)[6]

This Court has not previously considered this precise issue.[7] In Phoenix Indemnity Co. v. Givens, 5 Cir. 1959, 263 F.2d 858, the defendant complained that

---

6. McWeeney was preceded in the Second Circuit by Stokes v. United States, 2 Cir. 1944, 144 F.2d 82, 87, where the Court held in an appeal from a non-jury trial under the Suits in Admiralty Act that it was not error for the trial court to refuse to make deductions for future income taxes in computing expected earnings: "[s]uch deductions are too conjectural".

For subsequent refinements of the McWeeney rule, no more than peripherally pertinent to our problem here, see among other Second Circuit cases, the following: Montellier v. United States, 2 Cir. 1963, 315 F.2d 180, holding in a federal tort claim case that it was not error for the trial judge to compute loss for future earnings by ignoring impact of income taxes on a projected annual income of $11,150.00, but indicating that this figure was close to being large enough to fall into the McWeeney exception; Cunning-

ham v. Rederiet Vendeggen A/S and M/S Trolleggen, 2 Cir. 1964, 333 F.2d 308, expanding the rule to non-jury trials; LeRoy v. Sabeena Belgian World Airlines, 2 Cir. 1965, 344 F.2d 266, holding that anticipated immediate future income of $16,000, reaching $25,000 for nine years brought that case within the McWeeney exception, and that it was not error for the trial court (non-jury) in its computations to make deductions for future income taxes; and Petition of Marina Mercante Nicaraguense, S.A., 2 Cir. 1966, 364 F.2d 118, reiterating McWeeney's application to non-jury trials.

7. See Greco v. Seaboard Coast Line R.R. Co., 5 Cir. 1972, 464 F.2d 496 and cases there cited, including Prudential Insurance Company of America v. Wilkerson, text infra, for our latest treatment of the allied question of the propriety of an instruction as to jury awards being nontaxable.

the trial judge had erred in admitting evidence as to the gross amount of the plaintiff's earnings. We perceived no error in that ruling and indicated that the defendant possessed the option of introducing evidence to contradict or to explain that gross earnings are not synonymous with take-home pay. We held, in Prudential Insurance Company of America v. Wilkerson, 5 Cir. 1964, 327 F.2d 997, that the trial court had properly refused to instruct the jury that the amount of the recovery was not subject to federal or state income taxes. In Hartz v. United States, 5 Cir. 1969, 415 F.2d 259, a suit against the United States under the Federal Tort Claims Act for wrongful death, an annual income of $65,000.00 was involved and we held that it was appropriate for the district court (sitting without a jury) to consider the plaintiff's income tax liability on lost future earnings. In dictum we noted:

"It has been frequently thought that in the ordinary jury-tried personal injury suit, it would introduce too many complicating factors to permit the ordinary defendant to seek a reduction of the potential claim against him .by giving consideration to the matter of income taxes that would have been paid by the decedent. This is understandable and we find no fault with the decisions that in personal injury actions *between private parties* no consideration need be given to the incidence of taxation." 415 F.2d at 264–265.

■■ With all deference to Professors Harper and James, we are of the opinion that the rule enunciated in *McWeeney* supra, is both sound and in harmony with this Court's prior decisions and observations in this area. Accordingly, we

hold that the district court erred in excluding from the jury's consideration evidence of Blue's gross earnings history and in instructing the jury that, in making an award for future loss of earnings, they were to concern themselves only with net income.[8] The jury should have been permitted to receive the evidence as to gross earnings offered by the plaintiff.

## THE APPROPRIATE INTEREST RATE

As noted earlier in this opinion, the district court charged the jury that they should reduce any award for loss of future earnings through the use of an interest rate "at this time and place upon investments in safe securities by someone of plaintiff's financial experience and skill". It is undisputed that at the time of the trial, mid-May, 1971, interest rates payable upon high-grade corporate securities were at an historic high. We take judicial notice of the fact that such corporate yields have dropped substantially since the trial in this case.

In Chesapeake & Ohio Railway v. Kelly, 1916, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117, the Supreme Court held that in actions brought under the FELA, it was mandatory that awards for loss of future earnings be reduced to present value through the use of an appropriate interest rate. But the Court did not have occasion to deal with a situation wherein interest rates were fluctuating to a significant extent, such as the case we face here.

In discussing the disadvantages of a single lump sum recovery system, Harper and James note:

"Another important aspect of a single recovery is the burden it casts on the successful plaintiff of wise invest-

---

8. Several of our sister courts of appeals have arrived at a similar conclusion. See, e. g., Boston and Maine R.R. v. Talbert, 1 Cir. 1966, 360 F.2d 286; Domeracki v. Humble Oil & Refining Co., 3 Cir. 1971, 443 F.2d 1245, cert. denied 1971, 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d

165 (cautionary instruction to be given at request of defendant to the effect that personal injury awards are not subject to federal income taxation); United States Steel Corp. v. Lamp, 6 Cir. 1970, 436 F.2d 1256; Cox v. Northwest Airlines, Inc., 7 Cir. 1967, 379 F.2d 893.

ment and of providence, wherever the recovery must be relied on to take care of future needs. In 1947 the Railroad Retirement Board published the results of a study of work injuries in the railroad industry for the years 1938–1940. As part of that study some 1700 employees and survivors were interviewed as to how they disposed of their settlement payments, which had been by way of lump sum. The report concluded (on this point) that as to such settlements 'their disposition is not generally such as to offer assurance of a stable substitute for the loss of wages incurred in the severe and fatal injuries." "The Law of Torts", Harper and James, § 25.2, pages 1303–1304.

We are of the view that the district court erred in instructing the jury to reduce any award for loss of future earnings through the utilization of an interest rate equivalent to the return on high-grade corporate securities *prevailing at the time and place of the trial*. The district court's instruction was clearly predicated upon the assumption that Blue, upon receipt of an award for loss of future earnings, would immediately invest that recovery in long-term, high-quality corporate securities and hold those securities until maturity (assuming that the securities were not called by the issuing corporations). *That assumption overlooks the distinct possibility that Blue might well encounter a transient need for liquid funds to meet an emergency situation* and would not be able to reinvest the funds at the same high rate of return once the emergency situation was over. In other words, the district court's instruction envisioned no resort on Blue's part to the principal of the fund during the remainder of his projected work-life. In that respect, the district court's conception of the role of the single lump sum recovery was, in our opinion, distorted and erroneous. We hold that the jury

should have been instructed to reduce the award for loss of future earnings, if any, through the use of an appropriate interest rate *over the period of the remaining anticipated work-life* of the plaintiff, Blue. Although not a scientifically perfect method of dealing with fluctuating interest rates, at least such an instruction would have enabled the jury to consider the fact that corporate yields at the time of the trial were unusually high and were clearly subject to downward movements in the months and years to come.

## CONCLUSION

Blue, following the rendition of the verdict in this case, moved the district court for a new trial limited to the issue of damages or, in the alternative, for a new trial on all issues. That motion was overruled and a similar request has been made to this Court on appeal.

Because Western so strenuously and vigorously pressed its mitigation defense of Blue's contributory negligence during the district court proceedings and because that defense was not insubstantial, we have no alternative but to remand this matter for a new trial on all issues. As the Supreme Court noted in Norfolk Southern Railroad Co. v. Ferebee, 1915, 238 U.S. 269, 35 S.Ct. 781, 59 L.Ed. 1303, partial reversals and remands in FELA cases are not favored unless it conclusively appears that such a disposition will not prejudice the party which has not prevailed on appeal. We have no way of knowing to what extent the jury reduced its award for Blue on the basis of a finding of Blue's contributory negligence. Such a situation would and should have been avoided through the use of special interrogatories under Rule 49, Federal Rules of Civil Procedure.

The judgment of the district court is reversed and the cause is remanded for a new trial as to all issues, liability as well as damages.