PAULSON, Respondent, vs. SCOTT, Appellant.

*November 6—December 4, 1951.*

For the appellant there was a brief by *Hansen, Kaiser & Steinbring* and *E. B. Bundy,* all of Eau Claire, and oral argument by *Mr. John D. Kaiser* and *Mr. Bundy.*

For the respondent there was a brief by *Stafford & Stafford* of Chippewa Falls, and oral argument by *Harold E. Stafford.*

FAIRCHILD, J.   The plaintiff was married to Helen Gunderson in December, 1946.  The evidence sustains the determination that in spite of some difficulties between them a consistent marriage relation continued until the defendant Scott became the employer of plaintiff's wife.

The essential elements constituting a cause of action for alienation of affections are: "(a) The wrongful conduct of the defendant; (b) plaintiff's loss of the affection or consortium of the other spouse; and (c) causal connection between such conduct and such loss." *Maahs v. Schultz* (1932), 207 Wis. 624, 633, 242 N. W. 195.

The claimed responsibility of the defendant for the resulting alienation places upon the plaintiff the burden of proof of each element.  In judging the testimony in this case we find the following facts are established:

The wife entered the employment of the defendant at his restaurant in November, 1949.  Her hours were from early evening to closing.  The defendant was an operator of Scott's Nite Club, the tavern and dance hall on the outskirts of the city of Eau Claire where Mrs. Paulson was employed as a waitress until early in January, 1950.  The plaintiff and Mrs. Paulson were living together as husband and wife when this employment began.  Occasionally the defendant called for Mrs. Paulson on his way to work and gave her transportation to the night club, and occasionally he brought her, and other employees, home after work.  There is no evidence of improper conduct on these occasions.

However, on December 6, 1949, in the early morning after the night club had closed, Scott took Mrs. Paulson for a ride in his automobile.  This was for pleasure and had no business purpose.  They stopped for refreshments at the Cross Roads Cafe and there they were joined by one Ronnie Guch; and the three continued the drive until Scott lost

control of the automobile and it was wrecked. All the occupants sustained superficial injuries. Mrs. Paulson's injuries kept her from work for a week or ten days. Referring to the Paulsons and to this drive, Scott himself testified: "I seen they started having trouble from that time on that I know of, and arguments, I guess, where he bawled her out on account of being in the accident with me." On December 21st, Mr. and Mrs. Paulson joined the employees of Scott's Night Club at a party given by the chef. A violent quarrel occurred in which Paulson struck his wife, knocking her down. The cause of the quarrel is not stated. On New Year's Eve Paulson came to the night club but he was not permitted to come in, and he raised some disturbance. Mrs. Paulson left her husband on January 1, 1950, and began an action for divorce on the grounds of cruel and inhuman treatment on January 3, 1950. One allegation of her complaint was that Paulson wrongfully accused her of wrongful association with other men. Scott testified that about a week after January 1st, Mr. Paulson objected to his wife working any longer at the night club, and as a result the club dismissed her. Some time after this Paulson sent the following undated letter:

"Scotts Night Club
"I want to tell you that it is perfectly alright with me if Helen works at your club and that I hold nothing against you for what happened between us. I am also sorry what has happened in the past, meaning New Years Eve. I was under the influence of liquor at the time and didn't realize what I was doing. I will not molest her at her job or bother her in any way.
"[s] John T. Paulson"

The night club did not re-employ her.

After obtaining her divorce on February 6, 1950, Mrs. Paulson went to Minneapolis to work. She became acquainted there with a woman who testified at the trial and

in whose home she lived from June to September. The witness observed that Mrs. Paulson was about three months pregnant in March or April, 1950, which puts the date of conception in December or January. This witness also observed that Scott came to see Mrs. Paulson almost every week and that they stayed out overnight. Scott regularly sent money to Mrs. Paulson—$10 to $15 per week according to his testimony. In September, 1950, Mrs. Paulson returned to Eau Claire and lived in the home of her brother and his wife. In this home there was a telephone with an extension leading to the brother's bedroom. Mrs. Paulson had frequent telephone conversations with Scott, and the brother listened in on the extension and with a recording machine made records of such conversations as he overheard. The brother testified from memory concerning the conversations, and the records which he had made were played over a loud-speaker to the jury. Identification by the brother of the voices of Mr. Scott and Mrs. Paulson was positive, and Scott did not deny that the records were of his voice. In the brother's testimony from memory of these conversations and in the records, Scott acknowledged that he was the father of the child which Mrs. Paulson was expecting. The records were made in late September, 1950, at which time the baby had not been born. There is no evidence as to when the birth took place, but in the testimony there is evidence of a conversation between defendant and Mrs. Paulson to the following effect:

"Helen: 'Oh, yeah, have I got a lotta nice clothes for my baby, thanks to you.'
"Myron: 'Well, I can, but giving you money and stuff like that, I'm sticking my neck out a long ways.'"

The court submitted the verdict set forth in the statement preceding this opinion.

The defendant's first contention is that there is not sufficient evidence in the record to support the finding of the jury that between November, 1949, and February 6, 1950, he had alienated the affections of the plaintiff's wife from the plaintiff. He considers the testimony concerning the actions of Scott and Mrs. Paulson in Minneapolis when she was a divorced woman to be incompetent and prejudicial. Evidence of the association and behavior of the wife and the defendant after the divorce is, under certain circumstances, admissible to explain the defendant's conduct prior to the divorce. *Helminiak v. Przekurat* (1924), 184 Wis. 417, 424, 198 N. W. 746. In the present action the association and behavior of Mr. Scott and Mrs. Paulson from June to September, 1950, in Minneapolis, is part of a continuous line of conduct, commencing prior to the divorce action, with the joy ride of December 6, 1949. That course of conduct, as the evidence shows, continued with the conception of Scott's child by Mrs. Paulson in December or January before the divorce, Mrs. Paulson's separation from her husband in January, Mr. Scott's frequent, regular trips to Minneapolis to be with her during her pregnancy, and included his supplying her with money during that time—conduct corroborative of Scott's admission of his status as Mrs. Paulson's lover and the father of her child. Defendant's conduct after the date of the divorce being part of a continuous line, it is therefore considered that testimony as to such behavior is competent and relevant to explain defendant's conduct prior to the divorce and supports the conclusion of the jury that Scott's association with Mrs. Paulson before February 6, 1950, the date of the divorce, was not exclusively for business reasons. The finding that between November, 1949, and February 6, 1950, the defendant alienated Mrs. Paulson's affections has support in the evidence.

The defendant also challenges the verdict as fatally defective because it does not contain a question as to the acts

of the defendant being the controlling cause of the plaintiff's loss of his wife's affections. Although the verdict is termed a special verdict, its form is really that of a general one. The elements of an action for alienation of affections have been set forth as ruled in *Maahs v. Schultz, supra.* However, defendant submits that there should have been a question in the verdict as to whether or not there was such causal connection as the controlling cause of the loss of affections. Questions on all three elements would not have been improper, but we do not consider that they are necessary. The question submitted presented the issue of fact to the jury, and the court instructed that: "The plaintiff must prove that the defendant Myron Scott conducted himself wrongfully, that the plaintiff lost the affection and consortium of his wife, and that there was a causal connection between the conduct of the defendant Myron Scott and such loss. This causal connection must be the controlling cause, that is, the conduct of the defendant must be such that it was the cause of the plaintiff's loss of his wife's affections and consortium." In this case, at least, the subsequent events throw the full light of exposure on the line of conduct and show defendant's attentions to be serious acts capable of alienating the affections of the wife from her husband.

The court further instructed that if the jury believed from the evidence that the plaintiff himself by his own misconduct brought about the trouble and separation, or that the wife of her own accord left him, and was not induced to do so wrongfully and maliciously, they should find for the defendant and should also find for the defendant if the jury believed that the interference with the marriage was the voluntary bestowal of the wife's affections upon the defendant who did nothing wrongful to gain such affections. We consider that the question, with the instructions, under the circumstances of this action, was adequate and proper and that no prejudice to the defendant arose from this form of verdict.

The defendant further contends that it was error for the trial court to reject the requested question in the special verdict: "Were the acts of the defendant, Myron Scott, the result of malice or bad intent toward the plaintiff John T. Paulson?" He asserts that no finding of punitive damages can stand without a finding by the jury that the acts of the defendant were wicked, wilful, and malicious. We do not think this objection is well taken. Where the act itself is wrongful, malice is presumed. ". . . an actual intent to alienate is not necessary if defendant's acts are inherently wrong and seductive and tend to and do have the effect complained of." 42 C. J. S., Husband and Wife, p. 317, sec. 662. "The malice with which an act must have been done to warrant awarding of exemplary damages in action for alienation of affections under a statute may be implied from a wrongful act, injurious to another, done with deliberate intention to do a grievous wrong, without legal justification or excuse." 42 C. J. S., Husband and Wife, p. 350, sec. 695, note 73. The seduction of a wife is of such a nature that an action for punitive damages will lie regardless of whether the seducer meant to injure the husband or only to gratify the wife or himself. Injury to the husband follows as a natural and probable consequence of the seducer's act and his intent to accomplish such natural and probable results of his action is to be presumed. In addition to the authorities just referred to, we find in 27 Am. Jur., Husband and Wife, p. 147, sec. 546, treating with punitive or exemplary damages, the following text which is supported by citations: "But malice is shown within the rule, not only as to a cause of action, but as to the right to punitive damages, where it is shown that the defendant intentionally seduced and debauched the plaintiff's wife." And in sec. 552 we find authority for the presumption of malice from the fact of adultery with the plaintiff's spouse.

Defendant further submits that it was error to allow the wire recordings to be offered in evidence because the statements of Mrs. Paulson thus came into evidence as well as those of the defendant. It is urged upon us that since she is not a party to the action, her statements of fact concerning the defendant are merely hearsay. This, of course, would be true if a witness was repeating statements made by Mrs. Paulson to him or to other third parties concerning the conduct of Scott, but that is not the case here. Mrs. Paulson's statements were made directly to Scott. It is not her statements which are offered as proof of the fact. The proof is in Scott's answers or failure to answer a statement made directly to him by Mrs. Paulson. One who heard the statement and the reply may testify to them. The objection was made to the competency of the wire recordings *in toto,* as incompetent *per se,* and we think it was properly overruled. Conceding that there is some irrelevant matter and some that is incompetent in the course of the recorded conversations, no prejudicial error exists. Such portions were not individually objected to, doubtless because they were of no consequence when considered in connection with the evidence bearing directly upon the relations of defendant with the estranged spouse. We conclude that the general objection to the records as a whole was not well taken. The defendant's other objection to the admission of the recordings—that the conversations were incompetent because held long after the granting of the divorce—has been considered earlier in the opinion and determined against the defendant.

*By the Court.*—Judgment affirmed.